## FIRST–CITIZENS BANK & TRUST CO. v. UNITED STATES.

### No. 17846.

Court of Claims.
March 1, 1948.

Albert E. Conradis, of Washington, D. C. (Hill Yarborough, of Louisburg, N. C., on the brief), for plaintiff.

P. M. Cox, of Washington D. C., and John F. Sonnett, Asst. Atty. Gen., for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

LITTLETON, Judge.

The First-Citizens Bank and Trust Co., a corporation, is administrator of the estate of C. A. Ragland, Sr., deceased, the successful bidder and contractor for the construction of two projects, consisting of grading, draining, the construction of crushed stone surfacing, and other work, on the Shenandoah-Great Smoky Mountains Parkway. As administrator it has succeeded to whatever rights the decedent contractor may have had under two contracts entered into by him with the Government for the performance of this work. In this opinion the term "plaintiff" is used, for convenience, to refer to the contractor, C. A. Ragland, Sr., unless otherwise indicated.

The work to be performed under the contract executed December 14, 1935, was designated as Project 1T1, and covered a length of 9.222 miles in Floyd, Patrick and Carroll counties, Virginia. On the basis of the estimated quantity of all items of work and the unit prices shown in the bid schedule, the contract price was $213,566.50. Under the contract executed February 17, 1936, the work designated as Project 2E2 covered 8.178 miles in Ashe, Wilkes and Watauga counties, North Carolina. On a similar basis the contract price was $246,-812.50. The first contract was signed by Oscar L. Chapman, Assistant Secretary of the Interior, and the second by J. A. Walters, First Assistant Secretary of the Interior, as contracting officers. Both contracts designated the Chief of Bureau of Public Roads, Department of Agriculture, as the authorized representative of the head of the department, and designated the

Chief of Bureau, the Chief Engineer and the District Engineer, Bureau of Public Roads, as the authorized representatives of the contracting officers.

██ Following completion of Project 1T1 on October 12, 1937, and of Project 2E2 in December 1937, plaintiff filed with the Bureau of Public Roads claims for additional compensation in the amount of $14,378.22 on Project 1T1 and in the amount of $46,819.96 for Project 2E2. The general nature of the various items comprising these claims is set forth in finding 4. The claims were reviewed by the Government engineers having immediate supervision of the two projects, and by the District Engineer (who constituted the contracting officer's authorized representative), and were disapproved for payment in any part. Subsequent thereto the claims were rejected by the Comptroller General of the United States, as well. Plaintiff thereafter sought Congressional relief which took the form of Senate Bill 961, 78th Congress, 1st Session, proposing payment to the plaintiff of the sum of the $61,198.18, in full settlement of his claims against the United States for work done under Projects 1T1 and 2E2. By Senate Resolution 256, introduced April 6, 1944, this bill was referred to this court for action in accordance with the provisions of section 151 of the Judicial Code.

Section 151 of the Judicial Code, 28 U.S. C.A. § 257, in addition to requiring the court to investigate and determine the facts in the case and report the same to the referring House of Congress together with such conclusions as shall be sufficient to inform Congress of the nature and character of the demand, either as a claim, legal or equitable, or as a gratuity against the United States, and the amount, if any, legally or equitably due from the United States to the claimant, provides that "If it shall appear to the satisfaction of the court upon the facts established, that under existing laws or the provisions of this chapter, the subject matter of the bill is such that it has jurisdiction to render judgment or decree thereon, it shall proceed to do so * * *." Plaintiff's petition does not seek to invoke the jurisdiction of the court to render judgment on the claims under that portion of section 151 above quoted. It asks that the court hear and determine the facts and make report thereof to the Senate. It appears that the claims were neither filed in this court nor transmitted here by the Senate within six years after they first accrued, as provided in section 156 of the Judicial Code, in order that they be not barred as claims against the United States cognizable by the court under its general jurisdiction. Many of plaintiff's claims involve a demand for equitable adjustment of the contract price on account of alleged increases in the cost of performance due to changes or extras not directed in writing or not timely protested, or not submitted to the contracting officer for decision, nor appealed to the head of the department concerned, as provided for in the contract. The provision of the Senate Resolution that this court shall proceed with the reference and report to the Senate "irrespective of any statute-of-limitations bar, and irrespective of any administrative requirements or contractual provisions relating to notice of protest as to filing claim therefor," does not remove the bar of the statute of limitations nor cure the failure of the plaintiff to follow the administrative procedure provided in the contract for adjusting matters of dispute, so as to give the plaintiff a claim, legal or equitable, upon which this court can render judgment. When the contractor chooses without due cause to ignore such contract provisions for settling disputes under the contract it is error for the Court of Claims to entertain and decide the claims involving those disputes, however meritorious the claims may otherwise be. United States v. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192.

The matter of reimbursement to plaintiff with respect to any of the items involved in this proceeding lies, therefore, solely within the discretion of Congress. To that end we proceed to a consideration of the nature and character of the various items making up the claims, in order to give Congress our conclusions whether on the basis of the facts found any of the claims are meritorious and whether there are any amounts legally or equitably due from the United States to the claimant, notwithstanding

claimant is not, for the reasons indicated, entitled as a matter of law to a judgment of this court.

The facts established by the evidence, as set forth in special findings of fact, together with this opinion of our conclusions with respect to the various items of claim, will be certified to the Senate in accordance with Senate Resolution 256, referring to this court Senate Bill 961, in order that the Congress may decide what, if any, relief in the premises the plaintiff should receive.

## Reimbursement of Liquidated Damages (Finding 10)

This item involves the matter of liquidated damages in the amount of $280 assessed and collected for fourteen days of delay in completing Project 1T1 within the contract time as extended. With the advent of bad weather in December 1936, the contractor had requested and obtained a partial shutdown order, whereunder all operations except unclassified excavation were suspended. The suspension order set up a formula whereby only that portion of the partial shutdown period represented by the ratio of the excavation work to the total contract, to wit 47.2 percent, was to be charged against the contract time. The partial shutdown continued for a period of 121 days. Based on this formula 47.2 percent thereof, or 57 days, were charged against the contract time, during which period substantially no work other than excavation was being performed. Necessarily inherent in the formula employed by the Government was the concept that during the period of partial shutdown the contractor would not only be able to proceed with his normal excavation operations but by virtue of the 64 days of the partial shutdown not charged against the contract time, he would be able to accomplish enough additional excavation work to compensate for the 57 days less time in which to perform the other contract work.

From the evidence we cannot say whether, had the weather during the entire 121 days proved suitable for excavation work, such period for devotion exclusively to excavation work would have been a fair substitute for the loss of 57 days of the contract time. Actually the weather was unsuitable for the excavation work during part of the partial shutdown period. The evidence on this point is inadequate to support a finding in terms of days or groups of days where this condition obtained, but it is sufficient to warrant the conclusion that the time during which conditions were unsuitable even for excavation work was substantial. On the basis of the facts found we conclude that the contractor's failure to complete his contract within the time allowed was attributable to his failure to accomplish, during the months of bad weather when all other contract work was suspended, that amount of unclassified excavation necessary to allow him to complete the balance of the work within the contract time remaining after termination of the partial shutdown. The contractor succeeded in doing roughly about one-half the amount of excavation during the 121 days of partial shutdown necessarily contemplated under this formula.

Under a provision of the specifications entitled "Temporary Suspension of Work" the contracting officer was clothed with authority to suspend the work wholly or in part, for such period as he might deem necessary, due to unsuitable weather. In the absence of proof that during the unsuitable weather a modification of the partial shutdown order was requested and arbitrarily withheld, this provision of the specifications furnishes no basis for a legal claim by the plaintiff that he was entitled to a greater suspension of the running of the contract time than the 64 days accorded him. However, we are of opinion that the claim for the $280 is meritorious.

## Extra Overhaul on Crushed Stone Surfacing Due to Bridge Being Left Out at Round Meadow Creek (Finding 11)

This item of claim is for $1,650 sought by the contractor as additional compensation in connection with his furnishing of crushed stone surfacing on the portion of the highway lying north of Round Meadow Creek. The basis of the claim is that the crushed stone had to be hauled an additional quarter mile in order to detour around an open bridge site at Round Meadow Creek, shown on the contract drawings

when bids were submitted, but at which point plaintiff anticipated defendant would have erected a bridge by the time plaintiff would have need to use it in hauling the stone from his quarry lying south of that point. Plaintiff's contention is that he was thereby put to an additional expense not contemplated when making his bid for crushed stone surfacing.

Plaintiff was paid the contract unit price of $1.50 per ton for all tonnage of crushed stone actually incorporated in the surfacing work. The contract expressly stated that this unit price would be full compensation for all labor, materials, supplies, equipment, tools and incidentals necessary to complete the item.

Under the facts which we have found there is no merit to this claim. Plaintiff knew there was no existing bridge at this point in question when he undertook to furnish the crushed stone surfacing. He was not misled by any act or statement of defendant as to the time when a bridge would be erected at that point. There is no warranty inherent in the contract that such a bridge would be erected in time for plaintiff to use it in connection with his furnishing stone for surfacing. See United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154. Nor is there any ambiguity in the drawings and specifications affecting this item of work which might furnish a proper occasion, as plaintiff suggests, for adopting a rule of strict construction and resolving all doubts against defendant as the party preparing the contract and specifications. It seems to us that such additional expense as may have been occasioned to plaintiff by having to transport the crushed stone around the open bridge site was an expense with respect to which the Government had no responsibility to plaintiff under the contract or otherwise.

Even were we able to find, in plaintiff's expectation that the bridge would be constructed in time for his use, an obligation on defendant's part to fulfill this expectation, the proof would be insufficient to allow recovery of this item, for want of a sufficient showing of damage. Plaintiff has proceeded on the theory that he should be paid for the added haulage resulting from the absence of the bridge on the basis of 15 cents per cubic yard mileage, which is provided in the contract as a unit price for overhaul of excavated or borrowed material. The special conditions supplementing and modifying the specifications on Project 1T1 provide:

"When excavated or borrowed material is hauled as directed more than 1,000 feet, overhaul will be allowed on such material. The overhaul distance will be the distance between the centers of volume of the material in its original position and after placing, less 1,000 feet. This distance shall be measured along the shortest practicable route. The number of station yards of overhaul shall be the product of the volume of the overhauled material, measured in its original position in cubic yards by the overhaul distance in feet, divided by 100.

"Material hauled more than 2,000 feet will be computed as station yard haul for the first 2,000 feet, less 1,000 feet, and cubic yard mile haul for the balance of the distance hauled. The number of cubic yard miles of overhaul will be the product of the volume of the overhauled material, measured in its original position in cubic yards, by the distance hauled in excess of 2,000 feet, in feet, divided by 5,280.

"Basis of Payment. Overhaul will be paid for at the contract unit prices bid for the respective items."

This provision is clearly inapplicable to stone taken from plaintiff's quarry and there crushed and subsequently hauled to various points along the highway for use in crushed stone surfacing work. Defendant's agreement was to employ this basis of payment for overhaul only in connection with material excavated from cuts or from borrow pits, for placements in fills or use otherwise in the roadway construction. There is no promise to pay, for materials of any other nature, the contract unit prices therein specified, regardless of the right of the contractor to be compensated on some other basis for its expense in this latter regard. Moreover, as we have shown in our finding of facts in connection with this item of claim, plaintiff's computation which he offered as proof of the amount he should recover as compensation for the additional expense alleged to have been incurred fails to conform to the above-quoted

formula of measurement provided by the contract for use in applying the 15 cents per cubic yard per mile rate for overhaul. His compensation appears to have been made upon the basis of the quantity of the material (crushed stone) hauled from the quarry, rather than upon the basis of "the volume of the overhauled material, measured in its original position in cubic yards."

Having found that the only proof presented by plaintiff as a means of measuring his claim for additional compensation is inapplicable, we are left with nothing upon which a recovery could be allowed by way of reimbursement for increased cost of performance, assuming defendant to be (contrary to what we have found) chargeable for the additional mileage the crushed stone had to be hauled.

■ Plaintiff's belief that because the contract provided no unit price for overhaulage of crushed stone the unit price for overhaulage of excavation and borrow would furnish a fair basis for payment, and his computation based upon that assumption, cannot be substituted for proof of actual damage. "Information for Congress must be ascertained in strict conformity to the rules of judicial procedure from competent and admissible evidence taken by authority of law." State of West Virginia v. United States, 37 Ct.Cl. 201, 205.

### Extra Cost of Laying Back Slopes

#### (Finding 12)

■ This item of claim is for $9,909.85 and relates to extra costs alleged to have been incurred by plaintiff in laying back the slopes at various station locations on Project 1T1 and Project 2E2, as a result of the restaking of the slopes by defendant's engineers after they had first been cut in conformity with the stakes originally set by the project engineers.

Plaintiff's contention is that the resetting of the stakes was required on account of mistakes made by the defendant's engineers in computing the quantity of material necessary to construct the roadbed; that the re-laying back operations were more expensive to perform than the normal laying back operations involved in cutting a slope to a grade line initially set; and that payment at the contract unit price for excavation for the additional material excavated in the re-laying back operations did not adequately compensate plaintiff for the expense involved in these latter operations. In its brief plaintiff contends that for the extra labor and extra use of equipment entailed in such operations, over that required for normal laying back operations, plaintiff should be paid an additional fifty percent of the contract unit price for excavation, on the amount of excavation involved in recutting the slopes to the later stake line, on the ground that the labor and equipment employed in the re-laying back of the slopes accomplished only half the amount of excavation per unit of time which plaintiff could have performed if engaged on the work of cutting the slopes to final grade in a single operation. However, neither the claim filed with the Government following completion of the two projects, nor the computations offered in evidence in the present proceeding to support the claim on these items respecting the laying back of slopes, reflect this basis for arriving at the additional compensation sought to be recovered, but seek rather the recovery of a further payment based upon the cost per unit of time of the excavation equipment and crew, multiplied by the amount of extra time plaintiff estimated was required in the re-laying back of the slopes over the time which would have been required to perform such excavation under normal conditions.

In undertaking to evaluate the equity of this claim with respect to the items now being considered we are met with a fatal inadequacy of proof with respect to the extent, if any, to which defendant improperly demanded of plaintiff a performance beyond the reasonable scope of plaintiff's obligation. As will become apparent in our subsequent discussion, this defect exists, as well, with respect to proof of the added cost, if any, entailed in any such additional performance, beyond the amount plaintiff has been paid by virtue of having received the contract unit price for all excavation performed, both in connection with the original cutting of the slopes and in the subsequent cutting.

It is not disputed that in a number of instances the slopes, after having been initially cut, were restaked by defendant's project engineers and plaintiff orally directed to recut them to the new stake lines, in order to obtain additional material for the fills and embankments called for by the project plans. The evidence shows that slopes were restaked at twenty-two locations on Project 1T1, and ten locations on Project 2E2. To that extent there was a change in, or deviation from, the working drawings as they existed when plaintiff entered into his contract. However, the extent to which the need for additional material was attributable solely to errors by defendant's engineers, as plaintiff appears to contend, in establishing balance points between which estimates were made of the amount of material to be excavated and the amount of material needed for fills, is not shown in any measurable degree. It appears that in some instances the need for additional earth was occasioned by plaintiff's having placed earth in the bottoms of fills and covered it with rock subsequently excavated, necessitating in turn extra earth to cover this rock; in other instances the need was partially due to erosion of the slopes. In any event the evidence fails to show with any degree of certainty the extent to which the re-laying back of the slopes in question entailed demands upon the contractor for performance of work not within the proper limits of the contract.

The contract expressly provides that upon its completion the work shall be delivered complete and undamaged. The specifications state that—

"The intent is to prescribe a complete work or improvement which the contractor undertakes to do, in full compliance with the plans, these specifications, the 'Special Provisions,' bid and contract. The contractor shall perform the work in accordance with the lines, grades, typical cross sections, and dimensions shown on the plans or as modified by written orders involving 'changes' or imposed as a result of 'Changed conditions'; he shall furnish, unless otherwise provided in the specifications or in the contract, all materials, implements, machinery, equipment, tools, supplies and labor necessary to the prosecution of the work."

Our findings of fact show that the recutting of slopes, for which plaintiff seeks additional compensation, was confined to such operations as were necessary to furnish sufficient material to construct the roadway and fills within the contract requirements. The slopes were not laid back a second or third time for the purpose of achieving a final contour different from that shown on the contract darwings. Nor was this done in order to complete additional fills or additional roadway not called for by the plans.

Viewing the contract documents as a whole, it cannot be said that the parties thereto contemplated that balance points established by the engineers, as shown on the plans, would prove to be perfect, and that any deviations therefrom would, regardless of the cause or extent thereof, be deemed changes in the contract for which plaintiff would be entitled to ask compensation on some other basis than the unit price for excavation fixed by the contract. The specifications plainly contemplated that the estimated amounts of material within the various balance points indicated on the drawings might not work out in practice. They expressly provide for the acquisition of additional material either from borrow pits or "by widening or 'daylighting' cuts as directed by the engineer," and for payment of a unit price for such excavation similar to that provided for the excavation indicated on the drawings. The quantities listed in the bid schedule for the various items of work such as unclassified excavation and excavation for borrow are stated to be approximate only. We are not satisfied from the evidence presented with respect to this item of claim, that the resetting of the stakes by defendant's engineers so as to require a further laying back of the slopes at the various locations in question, was more than a proper use of this provision for alterations in the plans within the four corners of the contract.

We do not imply that such a provision for deviation from the drawings is to be availed of by defendant beyond reasonable limits, or in such fashion as to place upon

plaintiff, of necessity, a burden of performance which may not be regarded as having been fairly and reasonably within the contemplation of the parties when they entered into the contract. Cf. Freund v. United States, 260 U.S. 60, 62, 43 S.Ct. 70, 67 L. Ed. 131. It is conceivable that the estimates of the defendant's engineers with respect to the various balance points might have been so erroneous that recourse to the provision for permitting alteration in the plans would be little short of a remoulding of the contract. In such case we would be warranted in finding a basis for some equitable adjustment of the price due plaintiff for the added expense resulting from such erroneous plans. However, the facts in this case, as we have been able to find them from the evidence presented, do not persuade us that such a situation here exists.

Little more appears than that the recutting of the slopes resulted from the inability of defendant's engineers to anticipate to an exact degree prior to actual construction just how much the slopes at a given point on the highway would have to be cut in order to construct the necessary fills in the adjacent sections of the highway. It does not appear that plaintiff protested against the changes in the slopes at the time such adjustments were made, on the ground that they constituted changes in the contract, requiring an equitable adjustment of the amount to be paid thereunder and a written modification of the contract, as provided in Article 3 thereof. We do not refer to this lack of protest as a justification for not finding the facts as they may be established, but notwithstanding the direction of the Senate Resolution that we report our findings and conclusions as to the nature and character of plaintiff's claims "irrespective of any administrative or contractual provision relating to notice of protest as to filing claims therefor," it is not possible from the standpoint of the evidence to totally ignore such provisions of the contract which were intended to provide a means for determining what work the contractor considered was being required of him beyond that initially contemplated by the contract. Had plaintiff protested and insisted upon written orders for the recutting of the slopes to newly set stakes, and asserted a claim for adjustment of the price to be paid for such work, defendant's engineers might have directed plaintiff to open borrow pits, as they were authorized by the contract to do, and to obtain the material needed from such sources. That no such pits were in fact designated on the projects means nothing, since the need for such did not arise to meet any protest from plaintiff against securing the material from the slopes at the regular unit price for excavation.

This failure on the part of plaintiff to request written orders at such times as he may have felt that the recutting of slopes involved changes properly calling for an increase in the amount due under the contract, makes it impossible for use to determine at this time, with any degree of certainty, whether any amount may be said to be fairly due from the United States to claimant on this item of claim. We have no way of determining from the evidence now before us to what extent, if any, the departures from the lines, grades, and dimensions of the slopes, shown on the original plans, constituted changes in the contract imposed upon plaintiff by defendant of such a nature as to call for an equitable adjustment of the contract price.

Even had we been able to find from the evidence presented that a proper case for adjustment of the contract price existed with respect to the items of work here considered, we could not determine the proper amount which would be due, from the evidence presented. We cannot substitute for proof of a cost greater than that involved in the normal slope-cutting operations a mere computation by plaintiff based upon an estimate of the number of additional hours of time which were required for the recutting operations, which estimate in turn rests only upon plaintiff's belief that these latter operations required twice as much time to perform per unit of work as the normal operations. In concluding that plaintiff's proof in this respect is insufficient we do not depart from the accepted legal principle that damages are not rendered uncertain because they cannot be calculated with absolute exactness, and that it is sufficient if a reasonable basis of com-

putation is afforded, although the result may be approximate. See Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684. Plaintiff's proof falls short of this test. Whether or not it be concluded that the work forming the basis of the foregoing claim exceeded the contract requirements and constituted additional work not conpensated for by the payments made at unit prices for excavation, the cost of such work is not sufficiently established by the evidence.

We conclude that this claim lacks merit and that no amount is equitably due plaintiff thereon.

### Loss of Labor in Resloping Banks
### (Finding 13)

■ This item is for $335.50 for expenditures for labor in resloping the cut slopes at the ten locations on Project 2E2, referred to in the preceding item, subsequent to their being laid back to newly set stake lines (see finding 12). It is not apparent why it should be treated otherwise than as an element of this preceding item of claim. In this instance, as in the preceding item which involved the further excavation or laying back of the slopes to obtain material required for fills and embankments, after the slopes had been originally cut, and which required some duplication of effort and in some instances quite obviously some additional expense, the contractor had to do a certain amount of resloping and reshaping of the roadway cuts each time the stakes were reset and further excavation made. In doing this he found it necessary at times to employ hand labor methods where mechanical equipment could not be satisfactorily used, and thus incurred some expense which he would not have incurred had the same total amount of excavation been performed in one continuous operation. We have found the sum of $335.50 to be plaintiff's cost in resloping the banks; we do not deem this figure to be, in its entirety, in the nature of an extra cost. When the slopes were restaked and laid back by further excavation, plaintiff was paid for such additional excavation at the contract unit price. This unit price was intended to provide compensation not only

for the excavation and the proper disposition of the material excavated, but for the sloping and shaping of the roadway as well. To some extent, then, plaintiff has been paid for the expense incurred in the later sloping operations. The extent to which, if any, this indirect payment was inadequate to fulfill the obligation of the contract has not been shown. What we have stated with reference to the preceding item of claim is equally applicable here. We conclude that this item is without merit.

### Excessive Construction of Gutters
### (Finding 14)

■ This item of claim is for $8,145.-62 and is based upon an alleged discrepancy between the bid schedule and the plans, on both Project 1T1 and 2E2. The standard Government form of invitation for bids issued by defendant, and the bid schedule accompanying the standard Government form of bid submitted by plaintiff on Project 1T1, called for grouted rubble gutter in the approximate quantity of 3,000 square yards; on Project 2E2 approximately 2,600 square yards. The bid on each project was $1.00 per square yard. Plaintiff contends that in preparing his bids he interpreted the plans as calling for only 1,099 square yards of gutter on Project 1T1 and only 1,008.05 square yards on Project 2E2; that he was required to construct 3,033.3 square yards and 2,648.46 square yards, respectively, on the two projects; that his actual cost of constructing these gutters was $3.03 per square yard on Project 1T1 and $2.64 on Project 2E2; and that on that portion of the gutters in excess of the quantity indicated on the plans he should have been paid his actual cost of construction, plus 15 percent (presumably for profit), in lieu of the unit price of $1.00 per square yard in fact paid to him.

Plaintiff's interpretation of the plans as calling for only 1,099 square yards and 1,-008.05 square yards of gutter, notwithstanding the indicated quantities of approximately 3,000 square yards and 2,600 square yards appearing in the bid schedules, rests upon the fact that gutters to be installed between various stations on the highway in the aggregate amount of 3,956 linear feet

on Project 1T1 and 3,629 linear feet on Project 2E2, are listed on the plans, together with two diagrams of the method of tying in the gutters with other work, one showing a gutter three feet wide, the other a gutter less than two feet wide. Plaintiff says that by totaling the linear feet shown on the plans and taking two and one-half feet to be the average width, he calculated the square yardage he would be required to construct on each project, and accordingly bid $1.00 per square yard on the basis of such calculated quantities rather than on the much larger quantities shown on the bid schedules, and in the table of quantities appearing on the plans themselves.

There is no merit in this claim. We do not think the meaning given to the plan figures by plaintiff to be reasonable or warranted. The facts do not show this to be a case where the Government through errors or ambiguities in the drawings or specifications has misled the contractor into making a lower unit bid on a certain item of work than he otherwise would have made because the contract documents failed to indicate the true quantity of such work he would be required to perform. Cf. Lukens Dredging and Contracting Corporation v. United States, 90 Ct.Cl. 184. We do not here have a situation where a real discrepancy exists between two different parts of the contract documents, in which instance we might have occasion to balance the doubts against the defendant as the party who prepared and wrote the same, in reconciling the ambiguities. Plaintiff was advised of the approximate quantity of gutter he would be expected to construct, both in the Government's Invitation for Bids, and in the Table of Quantities shown on the plans. As against this he chose according to his subsequent contention, to rely upon the fact that certain stretches of gutter were specifically listed on the plans as intended to be constructed at certain points along the highway, indulged in the asumption that these and none others were to be constructed under the job on which he was bidding, computed the total footage thus shown on the plans, reached his own conclusion from two typical diagrams of gutter construction that the average width would be two and one-half feet (though no dimension for the width of the guttering otherwise appears on the plans), and employing these figures for length and width calculated the square yardage he would have to construct as something in the neighborhood of about one-third the approximate quantities designated in the bidding documents. Viewing the facts in their most favorable light with regard to plaintiff's claim, we must conclude that had plaintiff in fact based his bid upon the computed yardage derived from the plan figures he would at the same time have been aware that such a calculated yardage total would be in clear conflict with the quantities shown on his bid. The specifications, under the section governing Control of Work, Coordination of Plans, Specifications and "Special Provisions," provided that "In case of conflict between the plans or general specifications and such standard forms approved by the President on November 19, 1926, as are involved in the contract, the provisions of said standard forms shall govern." The quantities for gutter construction which plaintiff chose to ignore, in choosing the inconsistent quantities derived from his own calculation based on the footage listed on the plans, were those contained in the bid schedules forming a part of the Standard Government Form of Bid (Standard Form No. 21, approved by the President November 19, 1926) involved in plaintiff's contracts. While the exact scope and meaning of the above-quoted provision is not entirely apparent, it sufficiently provides a warning to the contractor that should he, in figuring his bid, discover an apparent conflict between the plans and his bidding documents, he might not close his eyes to such and later insist that preference be given to the plan figures, as opposed to the quantities stated in the bidding documents, as the measure of the obligation under the contract most favorable to him. The general principle that ambiguous language in a contract shall be construed most strongly against the party preparing it is inapplicable in the present instance.

When the contractor agreed, in October of 1936, to substitute a rock-paved gutter for the grouted rubble gutter on which he had originally bid, he gave the defendant no indication that he had understood the

plans to call for no more than a total square yardage arrived at by multiplying the total linear footage shown on the plans by the average of the widths shown on the two typical gutter diagrams, to wit, 2½ feet. Notwithstanding the diagram of the rock-paved gutter, which was submitted to the contractor when the substituted gutter was proposed, showed the gutter to be a minimum width of two feet six inches, the contractor advised the Government engineer that he was "willing to make the change in the type of gutter at my unit price, on Project No. 2E2 Blue Ridge Parkway, showing quantity 2,600 yards Grouted Rubble Gutter at one dollar per square yard." We conclude that plaintiff's interpretation of the contract, including the plans, specifications, and bid proposal, respecting the quantity of gutter which he might be required to construct pursuant to his unit bid at $1.00 per square yard, was not, at that date, at variance with defendant's interpretation, and that it was not until plaintiff entered into the actual gutter construction in July of the following year that he conceived the idea that gutter work in excess of the quantity computed from linear footage on the plans should be treated as "extra" work, to be paid for on some basis other than his unit bid price.

Our conclusion that plaintiff has not been required to do more with respect to this item of work than the contract required of him, and that nothing is legally or equitably due from the United States on account thereof, has been reached independently of any consideration of plaintiff's contention that his actual cost of constructing the gutters on Project 1T1 was $3.03 per square yard, and on Project 2E2 $2.64 per square yard. A word should be said, however, with respect to this latter contention and with respect to the proof submitted by plaintiff to support such cost figures, in order that the Congress may be fully informed as to the merit of plaintiff's demand for the difference between these asserted costs and the amounts paid to plaintiff based upon the unit price of $1.00 fixed by the contract.

Plaintiff's proof as to the actual cost of constructing the gutter consists of the two statements of claim respecting guttering on the two projects, which were submitted to defendant on March 17, 1938, and two accompanying pages purporting to be schedules of cost of construction of the gutter. These statements of claim and accompanying papers, together with statements of claim on the various other items of claim asserted by plaintiff (finding 4), were admitted into evidence for the sole purpose of showing the claims which were made. The Commissioner expressly ruled that they were not being received as substantive evidence of the conclusions contained therein. Aside from these itemizations of the claim filed and the accompanying schedules tabulating the alleged costs of construction of the gutter, we have only the testimony of C. A. Ragland, Jr., the son of the contractor and who was associated with his father on the two highway projects, to the effect that the various figures listed on such schedules for labor, truck hire, and materials going into the construction of the gutter, were taken off the pay roll records. The testimony was exceedingly vague as to who did this paper work but the indication was that it was done by the contractor's office force under the supervision of either the contractor or his son. No testimony was directed to the question of the accuracy of these office records or any showing made as to the original sources from which they were made. There is no testimony to show whether the several amounts listed for labor, equipment and material were in fact necessarily expended in the construction of the gutter, aside from the general assertion of the witness that this was so. On the other hand no attempt was made by defendant to discredit the plaintiff's asserted costs or to place in question the reasonableness of the amounts claimed to have been expended.

Were we convinced that plaintiff's claim for additional compensation for the gutter construction was of a legal or equitable nature, which we are not, we would not be entirely satisfied from the showing made by plaintiff that the amount due from the United States should be computed on the basis of the cost of construction figures asserted by plaintiff. However, since defendant did not undertake to show plaintiff's cost to be otherwise, and did not except to

the Commissioner's findings that the cost of construction of the gutter on Project 1T1 was $3.03 per square yard, and on Project 2E2, $2.64, we would have little choice but to take these cost figures which we have adopted on this item of claim, notwithstanding they appear on their face to be excessive in view of the contractor's unit bid price for gutters.

## Miscellaneous Extra Work on Project 1T1 (Finding 15)

The ten items of claim amounting to $793.75 are grouped together in finding 15 and are based upon plaintiff's contention that he was required to perform work not indicated on the original cross sections, and that this resulted in expenditures for labor and equipment for which the unit prices paid did not adequately compensate him.

The facts as we have found them fail to show any amounts legally or equitably due plaintiff on these items. Under the contract providing for payment of the unit prices bid by plaintiff for the various items of work scheduled in his bid, and under the specifications governing the performance of such work, it is necessary for plaintiff to do more than merely show a departure from the specific work indicated on the plans, in order to become entitled to a greater compensation than that provided by the unit prices bid. Plaintiff must show that these deviations from the work shown on the plans entailed expenditures not intended to be fully compensated by paying for the added work at the unit prices. In a substantial number of instances during the performance of the work on these two highway projects the contractor was orally directed by the project engineers to vary the work shown on the plans. Only in a few instances was a written order issued. It is obvious that the engineers did not conceive these deviations from the plans to constitute "changes" or "changed conditions" or "extras" within the contemplation of articles 3, 4 and 5 of the contract. Nor does it appear that plaintiff so viewed them at the time the work was done, since there was no discussion of costs or insistence upon written orders being first issued covering such work, nor was there any claim made for an adjustment of the price to be paid for such work. In the present proceeding there is no adequate showing that plaintiff has not been fully paid for these miscellaneous items of so-called extra work within the intendment of the contract, through the medium of payment for all items of work performed by plaintiff of the nature covered by the bid schedule. The specifications, in dealing with the matter of measurement and payment, provide that work and material which may be required pursuant to articles 3, 4 and 5 of the contract will be paid for at the contract unit prices bid for work and material of the same character determined by the estimated cost of performance, except that if such work and material increase or decrease the cost of performance, the unit price therefor may be agreed upon not exceeding the estimated cost thereof plus fifteen percent. In the present case, where no agreement was sought to be reached at the time the so-called extra work was ordered to be performed, it is necessary that such work be shown to have materially increased the cost of performance so as not to have been fairly compensated for by the payments made at the contract unit price, before any further payment to plaintiff can be said to be equitably due from the United States. Upon a careful examination of each of the several items comprising this particular claim, we reach the conclusion that no such showing has been made with respect thereto.

(a) The item for $442.50, respecting the flattening of the fill slope at Station 790, arises out of certain additional excavation beyond that indicated on the original plans, which the contractor was called on to perform at a point where a State road intersected the new highway, in order to lower the grade of the road and make it accessible to the highway. As a result it became necessary to dispose of the excess material excavated. This was done by widening a nearby fill and shoulder. Plaintiff was paid for the additional excavation at the unit price, which price, according to the specifications, covered as well the work of disposing of the material excavated. We have found that plaintiff's cost of disposing of this additional material by widening the fill and shoulder and then dressing the slope

264

was $442.50, but plaintiff has not shown that any measurable part of this sum was not a necessary part of the work paid for under the unit price for excavation.

(b) The item of $30.30 for sloping the bank at Station 571+75 constitutes little more than a further effort on plaintiff's part to obtain compensation beyond the unit price bid for guttering, on the theory that the work required was not shown on the plans, and that payment at the unit price for the excavation and for the guttering entailed in such work was not full compensation for the work performed. Plaintiff seeks separate payment for hauling away the earth excavated in connection with the construction of a paved gutter ordered by the engineer to replace an unpaved ditch which was starting to erode, and for expense incurred in redressing the slope where this material had been temporarily deposited. Plaintiff has been paid at his unit prices for the excavation and gutter work from which this material was derived. The specifications and special conditions provide that such price and payment shall be full compensation for such incidental items of work connected therewith as the disposition of surplus material, that surplus excavation shall be used to widen embankments or flatten slopes, or shall be deposited in such other places as the engineer may direct, and that such work will not be measured or paid for directly, but shall be considered a necessary part of the work paid for under the contract price bid for excavation. Aside from the permissible assumption that plaintiff might have avoided some expense in disposing of the excess material had the gutter been shown on the plans and constructed prior to the surfacing of the adjacent roadway, the proof fails to show that the contractor has not been paid in full for the work connected with this item of work. In any event the mere submission of a statement of claim listing certain sums aggregating $30.30 as having been expended for hauling away the material and redressing the slope is not adequate proof that the latter construction of the gutter increased the cost of performance by such amount.

(c) Plaintiff's claim of $37.80 for resloping the left bank at Station 624, rests upon his contention that a gutter had been ordered at this point after the stone surfacing had been laid. In view of our finding that no gutter was constructed at this point plaintiff makes no claim with respect to this item.

(d) Plaintiff's claim of $32.40 for resloping the right bank at Station 624 is similar to his claim which we have discussed hereinabove in connection with the sloping of the bank at Station 571+75; although here a gutter was shown on the plans, it was not constructed until the stone surfacing was laid on the adjacent roadway. The earth excavated in constructing the gutter was temporarily placed on the slope and plaintiff later had to haul it away and redress the slope. While we have little more than the statement made on behalf of the contractor that a record was kept of the expenses incurred in this connection and that they amounted to $32.40, we have accepted this figure as his actual cost for hauling away the dirt and redressing the slope. This still does not establish the fact that plaintiff was not fairly compensated for some part, if not all, of this cost, by virtue of his having been paid the contract unit price for the construction of the gutter and for the excavation involved in the building of the same. As a part of this latter work plaintiff was required by the contract to dispose of the material excavated without additional compensation. He did not protest at the time the work was done that such payment under the contract would not fairly compensate him, and that an adjustment should be made because his cost of disposing of the dirt had been materially increased due to a change in the conditions under which it had to be done. Conceding for the sake of the discussion that plaintiff's over-all expense on this item might have been somewhat less had the gutter been staked out and constructed at an earlier date, this difference is not established by merely showing what he actually paid for disposing of the earth and putting into shape the slope upon which he had temporarily deposited it. Some part of this expense would have been incurred in any event, and paid for as a necessary part of the gutter work at the unit price bid for this latter. Even if we were to assume that

defendant was bound to so regulate the order of the work on the project that plaintiff could always perform his tasks with a minimum of expense, it does not sufficiently appear that any measurable part of this item of claim is either legally or equitably due plaintiff.

(e) and (f) On the basis of the facts appearing in our findings with regards to these items of claim in the amounts of $8.60 and $6.45 for removal and replacing dirt at the drop inlet at Station 784+87, and for crushed stone for the widened parking area at Station 495+00, we conclude that no sums have been shown to be due plaintiff on these items.

(g) (h) (i) (j) These items of claim in the amounts of $27.50, $60.00, $139.20 and $9.00, respectively, for flattening the fill slope at the access for Route 58, and the slopes at Stations 652 and 604+25, and rounding the fill slope at Stations 643+52, do not differ in principle from the claims asserted in regard to the alleged extra cost of laying back slopes (finding 12) and loss of labor resloping banks (finding 13). For the reasons assigned in our discussion of these latter claims, and for the additional reasons expressed hereinabove in connection with sub-item (b) of these miscellaneous claims, regarding the inadequacy of proof of the extent to which, if any, plaintiff's cost of performance had been increased, we conclude that these further items of claim are without merit.

### Additional Ditches (Finding 16)

This item of $1,446.90 relates to certain ditches which the contractor was orally directed to construct at various points along the highway, notwithstanding they were not shown on the original cross section plans. The essential facts pertaining to this claim are set forth in finding 16. In addition thereto the facts of a more general nature recited in finding 8 are also pertinent to this item.

The Government's invitation for bids on Projects 1T1 and 2E2 did not list the construction of ditches as a separate item of work. Plaintiff submitted no unit price for such work based upon some approximate quantity shown on the bidding documents, such as we found hereinabove with respect to gutters. The contract contains no provision for specifically paying for ditches as such. In describing "Roadway and Drainage Excavation" the specifications state that such item shall consist of excavating, sloping and shaping the roadway and shall include (among other things) the construction of ditches "all to the required alignment, grade, and cross section shown on the plans." Compensation for such work was to be obtained by means of the contract unit price for the excavation involved therein. Plaintiff contends that under a proper construction of the contract his obligation to construct ditches on this basis of payment must be limited to such ditches as are shown on the original cross section plans.

Plaintiff was required to construct a substantial number of ditches not indicated on the cross section plans, at an additional expense of $315 on Project 1T1, and an additional expense of $1,131.90 on Project 2E2. Defendant's position that such work was not an "extra" for which plaintiff should be paid anything more than the unit price for such excavation as might be involved therein, rests largely upon the meaning it attaches to the words "Ditch where designated" inscribed on a certain diagram appearing on the plans. This diagram shows a typical superelevated section of highway in a cut, and by means of a dotted line relates the words above-quoted to a particular area on such diagram, as the normal location for a ditch. We are asked to construe these words as a sufficient indication to the contractor, when he was making up his bid, that more ditching might be required than was shown on the cross section drawings, and that should the Government engineers during the course of construction designate additional ditches the contractor would be required to install them on the same basis for payment as though they too had been specifically indicated on the cross sections.

The words "Ditch where designated" are certainly susceptible of another meaning than that ascribed to them by the engineers of the Bureau of Public Roads. The contractor understood "where designated" as referring to those points on the detailed cross sections of the highway where the

drawing showed a ditch as part of the work to be performed. We think plaintiff's interpretation and understanding of the plans were not only reasonable but were correct, and we approve these items in full as a legal and equitable claim. All of the ditches for which plaintiff seeks additional compensation were constructed at points where the highway lay in a cut and where there was some superelevation, that is where the road surface was pitched at a slight angle, with one side slightly higher than the other. The nature of the slopes adjacent to the roadway, the pitch of the finished surface, the nature of the terrain, all would appear to enter into the problem of necessary drainage at such a given point. The cross sections by indicating that ditches were to be built at certain of these points evidenced the fact that some attention had been given to this problem by defendant in preparing the plans, and that drainage at various points where superelevation occurred was not a matter wholly to be determined as the actual construction work proceeded.

In the circumstances of this case the meaning given by defendant to the words "ditch where designated" and defendant's interpretation of the contract as obligating the contactor to install ditches wherever the engineers might designate, notwithstanding they were not indicated on the plans, can be sustained only by resolving all doubts in favor of the Government. This would be contrary to the well established rule that contracts, drawings, and specifications should not, for the purpose of resolving subsequent doubts as to the meaning and applicability of the language and provisions thereof to definite facts, conditions, and circumstances, be interpreted and construed in favor of the party who drafted and prepared them, but on the contrary should be interpreted more favorably to the other party who did not have any part in their preparation. Callahan Construction Co. v. United States, 91 Ct.Cl. 538, 611.

We do not understand plaintiff as seeking, in this item of claim, a larger measure of compensation for the construction of any of those ditches shown on the original plans than that provided through payment for the excavation involved. His complaint is not that, with respect to those ditches shown on the plans, he was required to exceed the normal requirements of the contract or that he was called upon to install ditches at such points in a manner or scope not contemplated when submitting his bid. So far as such ditches are concerned he seems to have recognized the fact which we pointed out in finding 8, that the quantities of work relating to drainage, like the quantities of material available for backfilling and surface dressing, were indeterminate before construction, and that with respect to such ditches the matter of their exact measurement and location and the time and manner of their installation were matters largely to be controlled by the conditions arising as the construction of the highway proceeded.

The basis of plaintiff's instant claim is that the ditches in question do not fall within the same category, and that the work involved in their construction does not come within the purview of the necessarily flexible requirements for drainage work indicated by the plans and specifications. The ditches indicated on the plans were roughly formed during grading operations, but the ditches orally ordered after the roadway had been graded had to be dug by hand. In many instances they required the removal of backfilling which plaintiff had already installed after excavating the cut below grade level, and to this extent a duplication of effort was required.

We conclude that plaintiff's claim on account of these additional ditches is meritorious, and that defendant should make reimbursement of plaintiff's expense in connection therewith, which aggregates on the two projects $1,446.90.

In connection with the amount found we recognize that, to the extent the additional ditches may have increased the total amount of excavation for which plaintiff has been paid, he has received some indirect compensation for the work involved in providing these additional ditches. However, this work was done by hand and neither party has been able to show the amount of such excavation. In any event this constitutes a negligible factor in view of the fact that a large number of the ditches were formed by removing backfilling, for which plaintiff would not have

been paid for more than the original excavation of the material so removed. The elimination, from the amount to be paid plaintiff for the additional ditches, of any additional sum for overhead and reasonable profit on the extra work thus involved, will more than offset any benefit plaintiff may have derived from an increase in the amount of unclassified excavation.

Extra Work on Subgrade (Finding 17)

■ This item in the amount of $241.80 relates to extra expense of $189.30 which the contractor incurred in bringing the highway to proper grade level, as a result of the erroneous setting of certain grade stakes by defendant's engineers, and $52.50 for delay in setting grade level stakes. In view of the finding with regard to this item of claim, to which no exception is taken, we find the first item to be allowable. Defendant concedes that the amount of $189.-30 is meritorious. It should be allowed in full.

Miscellaneous Extra Work on Project 2E2 (Finding 18)

We have grouped together in finding 18 a number of unrelated items of claim, under the heading of "miscellaneous extra work," in order to follow the procedure employed by counsel in identifying said claims during the taking of proofs.

■ (a) The first of these items relates to $476 of expense incurred by the contractor in performing, upon oral direction of the project engineer, additional work in obliterating an old road near Station 375, under substantially more burdensome conditions than existed when the initial work of obliteration was performed.

From the facts set forth in finding 18, it will be seen that during the early stages of the highway construction certain obliteration work was performed by the contractor employing the use of machinery. We may presume that this work was done "when and as ordered" by defendant's engineer, in keeping with the contract specification covering such work which we have set forth in finding 18. No claim is made for this earlier obliteration work. It appears to have been performed on the portion of the old road immediately adjacent to or a part of the ground to be occupied by the new highway. The only payment for such work which the contractor received was through his unit bid price for unclassified excavation of such material as was taken from the new roadway and used in obliterating the old road. This was the only means specifically provided in the specifications for compensating the contractor for whatever obliteration work the engineer might order. Neither the Government's invitation for bids nor the contractor's bid schedule contained any unit price for work in obliterating old roads. The specification covering such work is silent as to how payment shall be made for any such work ordered by the engineer, other than work to be performed "where the old road is immediately adjacent to or part of the ground to be occupied by the new road" and where "such obliteration shall be accompanied by widening or flattening of the roadway section of the highway or both." For such work the specification provided that payment be made under the "excavation" item. The work here involved which the engineer at a much later date required the contractor to perform in order to obliterate remote portions of the old road, and which work it was no longer possible to perform, except by hand labor, did not fit the description of the work for which payment under the "excavation" item was specified. Nor does it appear that the work actually performed by the contractor, in order to comply with the order of the Government's engineer that none of the old road be visible even when all foliage was gone from the trees and shrubbery, may be reasonably viewed as work of a nature which the parties when contracting would have contemplated should be performed without compensation, as merely incidental to other work for which payment was provided. It was left to the engineer to determine without express limitation how far the work should be carried in obliterating old roads visible from the new highway, when the old road was not on the site of or immediately adjacent to the new highway. We think it can not be said that under this provision the contractor could rightfully be required, without any reimbursement for his costs, to completely obliterate every

visible portion of the old county road which more or less paralleled the new highway for a substantial distance but was not immediately adjacent thereto.

It seems to us that it must have been intended, in view of the language employed in the specification, that some obliteration work might be ordered by the engineer for which it would be his duty to issue an extra work order and that under the circumstances which gave rise to the present item of claim he should have done so in order that plaintiff might be paid for his work. The increased cost resulting from the tardy direction to the contractor to eliminate further portions of the old road, after it was no longer possible to employ machinery to do the work, was not attributable to fault on the part of the contractor. This claim is meritorious and plaintiff ought to be reimbursed for the expense of $476.

■ (b) and (d) We find no merit in these items of claim in the amounts of $117.20 and $83, for moving rock at the false cut at Narrows, and for hauling dirt to dress the slope at the false cut, respectively. The expenses incurred by the contractor were incidental to the work required of him under the contract, and not in the nature of changes or extras for which the Government should, in equity, be charged.

■ (c) This item of claim relates to an item of expense in the amount of $72 for a power shovel and operator, employed in loading crushed stone from the contractor's stockpile onto trucks for hauling to various points where required for surfacing operations. Plaintiff seeks to charge this expense to the Government simply because he was allowed by the project engineer to place a quantity of stone on the stockpile greater than that for which payment was ultimately authorized, and hence, following the issuance of the extra work order fixing the quantity of stone to be left in the stockpile at a lesser figure, had to employ the excess amount of the stockpiled stone in surfacing operations in order to become entitled to be paid therefor. The facts present no basis for claim, either legal or equitable, against the United States for the contractor's separate expense in moving the stone from the stockpile to the site of the surfacing operations.

■ (e) This item relates to an expenditure of $70 incurred by the contractor in replacing the stone surface on a section of the highway after it had been completed but before final acceptance of the work. We have found that this repair work was necessitated by dirt in the subgrade spewing up on the surface stone, due to weather conditions, rather than to any defective work on the part of the contractor as defendant has argued. The work for which plaintiff now seeks to be reimbursed was work for which the contractor was not responsible under the contract; the Government has received the benefit of it, and aside from the contractor's failure at the time to protest the doing of it without a written order providing for payment for such work, we find no reason why plaintiff should not be reimbursed for it. This claim is meritorious and should be allowed.

■ (f) This item of claim in the amount of $57.40 relates to the cost incurred by the contractor in burning a stump pile which defendant's engineer had permitted the contractor to accumulate on private property adjacent to the highway during clearing operations. Defendant's later insistence that the stump pile be either hauled away or burned required the contractor to do no more than carry out, at a later time, presumably a more convenient time to him, just what the special provisions supplementing the specifications directed should be done as part of the work of "clearing and grubbing," and for which work the contractor was paid his unit price bid. There is no merit to this claim.

Northwest Shovel (Finding 19).

■ This item of claim for $2,160 relates to what plaintiff contends was an unauthorized interference on the part of the project engineer in the contractor's employment of certain of his equipment, namely, a Northwest shovel, with attendant equipment such as a bulldozer, several euclids and a hug, in performing the unclassified excavation called for under the contract, resulting in an alleged enforced idleness of such equipment and attendant crew for an aggregate of seventy-two hours at a loss in use value to the contractor of $30 per hour.

On the basis of the facts set forth in finding 19, we conclude that the enforced idleness of plaintiff's equipment may not be attributed to any requirement or demand by the project engineer not justifiable under the contract. Up to the time when the project engineer required the contractor to alter his method of operation, the latter had been moving his Northwest shovel from cut to cut along the highway for a distance of about two miles, removing the overlay of earth in each cut until rock was encountered, then moving on to the next cut, and so on, leaving the excavation of the underlying rock, which remained to be removed in order to fulfill his contract obligations, for a later operation after it had been sufficiently broken up with drilling equipment. This method of procedure did not conform with the reasonable requirements of the contract in several respects. It upset the balance between rock and earth excavation and the planned use of these respective materials in constructing fills and embankments. It resulted in the earth being placed in the base of the fills, instead of the rock which would otherwise have been available for this purpose, and in this fashion set the stage for a later need of additional earth to cover the rock when it was placed in the fills and embankments. It likewise left the work in an undesirable condition with respect to drainage and the dangers of erosion. Continuance of this method of performing the excavation work would also have placed the contractor in a position to demand monthly progress payments substantially out of proportion to the actual current progress of the contract work, since all unclassified excavation (except that for structures) was paid for at a single unit price of thirty cents per cubic yard, regardless of whether it consisted of solid rock requiring drilling, or of loose earth overlaying the rock beneath, which could be removed with much less effort and expense.

The engineer's direction to the contractor to abandon the method of operation upon which he was proceeding and to employ the Northwest shovel in clearing up the remaining excavation work between Stations 540 and 700, before continuing further along the highway with this equipment, came well within the scope of the specifications covering roadway and drainage excavation:

"All suitable materials removed from the excavation shall be used as far as practicable in the formation of the embankment, subgrade, shoulders, and at such other places as directed. No excavated material shall be wasted without written permission, and when such material is to be wasted it shall be disposed of as directed by the engineer. * * *

"Excavated rock shall be used in forming embankments wherever the depth of fill is sufficient to properly contain the rock removed by excavation, and shall be placed in accordance with directions given by the engineer. * * *

"Where directed by the Engineer, the Contractor shall leave untouched until otherwise instructed, in cuts or portions of cuts, the material which is considered satisfactory for topping of rock sections."

It is not necessary, in reaching this conclusion, to resolve all doubts in favor of defendant. The language employed is explicit and free from ambiguity.

The duty which this court has many times recognized as resting on the Government's engineer to abstain from unnecessarily or unreasonably interfering with the contractor's performance of his work, does not preclude the exercise of reasonable judgment on the part of the engineer in charge of the work as to how the work shall be carried on, whenever the contractor may be of the opinion that he can employ a different method in discharging his overall obligation under the contract with no additional cost to the other party, and with some possible saving of expense to himself. The principle mentioned must be given a reasonable interpretation. Its applicability in a given case must rest on the facts as they exist, not on what they might have been. And these facts must be viewed in the light of the respective rights and obligations which the parties have expressly or impliedly reserved to themselves by their contract.

In view of the facts which gave rise to the engineer's order on which plaintiff rests this claim, and the provisions of the specifications as to the manner in which the ex-

cavation work should be done, no amount appears to be legally or equitably due from the United States to plaintiff on this item of claim, notwithstanding compliance by the contractor with the engineer's order resulted in the Northwest shovel and attendant equipment standing idle for approximately 72 working hours. If the work had been originally properly carried on the equipment would doubtless have been idle a part of the time at least.

Even if we were able to find some sufficient ground upon which to rest an obligation in some amount on the part of the Government to reimburse the contractor for the use value of his equipment while it stood idle, the amount for which he filed claim would need to be reduced. Assuming that the equipment had been compelled to stand by idle as a result of some breach on the part of the Government, its fair rental value would be a proper item to be allowed as damages, provided only an allowance be made for the absence of any wear and tear on the equipment such as would necessarily have been incident to its hire and use on some other work. Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40; Ericsson v. United States, 62 F.Supp. 312, 104 Ct.Cl. 397. Considering the type of equipment involved and the conditions under which it was being employed on the project a discount of 10 percent from the proved rental value, because of the absence of actual use, would make the resulting figure an adequate measure of compensation.

### Lorain Shovel (Finding 20)

By this item of claim for $3,150 plaintiff seeks to be compensated for the employment of his smaller power shovel on certain work for which he contends that the contract unit price for excavation paid to him furnished him no compensation. It arises out of the same basic circumstances which gave rise to the proceeding item of claim. When the larger shovel was halted in its work of skimming off the overlay of earth at Station 700 and directed to be returned to Station 540 to clear up the rock excavation, the Lorain shovel which had been working in conjunction with it was assigned to the work of making a light cut about eight to ten feet wide along the line of the highway from Station 700 to the end of the project near Station 785.

As we have stated in finding 20 it has not been adequately established just how the Lorain came to be put on this particular work. It is the plaintiff's contention that the contractor was specifically directed to do this. On the other hand defendant contends that when the Northwest shovel was forced to turn back at Station 700 the contractor put the smaller shovel to work cutting a pioneer road to the end of the project for purposes of his own convenience, such as to assist him in getting in supplies and equipment. Both the contractor and the defendant's engineer had died prior to the taking of testimony on this point, and the evidence was vague and conflicting in many respects. It is not sufficient to convince us that the engineer specifically ordered the contractor to cut a road or trail from Station 700 or to employ the Lorain shovel on such work. Nor are we persuaded that plaintiff employed the shovel in this respect under specific protest that such use of the shovel was outside the requirements of his contract and, therefore, this was extra work for which additional compensation would be expected. There was no evidence of any written order by the project engineer that the shovel be so employed, nor of any protest by the contractor. It seems much more probable that the whole matter of dispute between the engineer and the contractor was as to the necessity and propriety of the engineer's direction to discontinue the procedure the contractor had been following in employing both the large and the small shovel in excavating the earth overlay from station to station without regard to the rock excavation remaining to be done at various points in the rear. When the engineer insisted that this procedure be discontinued with respect to the use of the Northwest shovel it necessarily affected the use of the smaller shovel, even though the latter was not needed to clear up the rock excavation between Stations 540 and 700. The Government engineers still did not want earth excavation placed in the bottom of fills where rock excavation was supposed to go. The Lorain shovel could not continue as it had been operating. Something had to be found for it to do until

the rock excavation work was brought up to date. The suggestion may have come from the project engineer that it be set to work doing what it could in the meantime to facilitate later work on the project by making a light cut along the line of the highway to Station 785. Or it may have been simply a matter of mutual understanding that this was the only alternative so long as the Government insisted that the work be carried on in the fashion described with reference to the preceding item of claim.

We find no basis in fact for treating this work upon which the Lorain shovel was engaged as extra work, to be compensated for on the basis of the contract unit price for excavation. It added nothing to the ultimate benefit defendant was to receive from the contractor's performance of his contract. The road or trail laid out by the Lorain shovel added nothing to the finished highway. Plaintiff's only possible ground for recovery would be that defendant had wrongfully added to the burden of his performance of his contract by imposing upon him some expense not contemplated in the contract, and for which the contract price furnished him no means of compensation. But on the basis of what we have found with reference to defendant's justification in ordering the contractor to change his method of excavation operations (finding 19 and our discussion of the preceding item of claim), we find no legal or equitable basis for charging the Government with whatever wasted effort the contractor may have spent in employing the Lorain shovel as he did.

We have found that the work upon which the shovel was engaged was not entirely unproductive as regards the ultimate accomplishment of the performance required of plaintiff under the contract. Material was excavated from the roadway by the shovel, even though it had to be temporarily deposited on the adjacent slopes. The shovel could probably have moved a greater quantity of material had it been elsewhere engaged. It appears that under normal circumstances the shovel was capable of moving 10,500 cubic yards in seven days. The evidence fails to establish how much material it actually moved during the period in question. It is certain that subsequent work was facilitated by the initial clearing and grading performed by the shovel.

To the extent that it was not possible to make final disposition of the excavated material by placing it directly in fills or embankments, resulting in the later necessity of again handling this material when the slopes upon which the material had been temporarily deposited were staked and cut back, this extra labor must be attributed to the fact that plaintiff was not in a position to dispose of the excavated material in one operation because of the manner in which he had performed other parts of his contract work, rather than to any unwarranted demand on the part of defendant.

Even assuming, for the sake of argument, that the project engineer had wrongfully compelled the contractor to employ his Lorain shovel for seven days in pioneering a trail between Stations 700 and 785, to the detriment of the contractor, the basis upon which plaintiff seeks to charge the Government the sum of $3,150 on account of the Lorain shovel is quite untenable. Plaintiff has not undertaken to measure, by any satisfactory evidence, the amount of additional expense actually incurred as a result of his employment of the Lorain shovel in the manner set forth in finding 20. He does not ask to be compensated for the additional expense which some wrongful conduct of the defendant has caused him to suffer. Rather, he asks to be allowed what he would have been entitled to receive had he had a contract, in addition to one upon which he was engaged, calling for a sufficient quantity of straight excavation at 30 cents per cubic yard upon which his shovel could have been employed at the full limit of its capacity for a period of seven days, and had the defendant wrongfully prevented him from performing this work. But the contractor had no such additional contract. The only contract he had on this project for excavation was the one which he actualy performed, and for which he was paid the unit price for all excavation performed, measured for purposes of pay as though there had been no second handling or movement of any of the material. Under the specifications this unit price paid for unclassified excavation was "full compensation for the excavation, and also for

the formation and the compaction of embankments, disposal of surplus structures and materials, preparation and completion of subgrade and shoulders, and the furnishing of all labor, equipment, tools and incidentals necessary to complete the work." Under no possible treatment of the facts appearing in this case could plaintiff be entitled to receive the sum for which he filed claim, without imposing upon defendant the obligation of a contract which it never made.

Even under the extreme assumption that the work to which the Lorain shovel was put during the seven days in question was just so much lost motion and of no benefit to the contractor in discharging his obligation under the contract for Project 2E2, the full measure of the contractor's damage would have been the actual loss of the use value of the shovel during such period. There is no sufficient evidence in the record upon which to make a finding of the fair rental value of the shovel. We have only the contractor's figure of $9.75 per hour at which he carried the Lorain shovel on his books for the purpose of estimating his contract bid. On the basis of such figure the use value of the shovel during the seven days would have been only $819.

### Wall or Embankment (Finding 21)

This item of claim for $16,944.-15 relates to the approximate 400-foot wall or embankment constructed by the contractor in the vicinity of Station 489+40 on Project 2E2. The contract called for construction of a "hand laid rock embankment, Type B" at this point, at a unit price of 90 cents per cubic yard. The contractor's contention is that he was required by the project engineer to erect a wall of a much more costly type than that required by the contract, and one more nearly approximating, if not conforming to, the specifications for a dry rubble masonry wall. The bid schedule called for the construction of approximately 150 cubic yards of dry rubble masonry by the contractor elsewhere on the project, at a unit bid price of $8.00 per cubic yard, and plaintiff seeks to have this rate of compensation applied to the 2,386.50 cubic yards of rock embankment which he erected at Station 489+40.

In erecting the structure in question, whether it be called a wall as plaintiff denominates it, or an embankment as defendant insists it should be termed, the contractor was required by the Government engineer to perform the work in a manner which necessarily increased the cost of performance beyond that which would have been necessary to meet the contract specifications for hand laid rock embankment—Type B. The wall which plaintiff was required to build was not of the type called for. Stones of a larger size than required by the specifications for this type of embankment were required to be placed in the wall. Although it does not appear that the contractor was specifically directed to employ machinery in order to lay the wall or embankment, the size of the stone had a direct bearing on this matter. The contractor found it necessary to bring a crane to the site of the work to assist in placing the stone in the wall, whereas if smaller stones had been used they could have been placed entirely by hand labor at less expense. That the unit price bid for hand laid rock embankment—Type B, was not intended as compensation for this sort of expense is evident upon a reading of the provision of the specification covering such embankment, designated "Basis of Payment."

The contractor was required to do more than simply lay the stones in place in their natural condition. To some extent the stones were required to be shaped by knocking off irregular projections. In order to meet the engineer's demands experienced stone masons were placed on the work. In other respects, as revealed in the findings of fact on this item of claim, the contractor was called upon to do the work in a manner not fairly or reasonably required by the specifications for the type of structure for which the contractor has bid 90 cents per cubic yard. It is a reasonable conclusion that the contractor's cost was substantially increased by performing the work in the manner demanded by the defendant's engineer. The difficulty lies in determining even approximately how much this cost was increased.

Once again we are confronted with the fact that plaintiff did not follow the method provided by the contract for seeking addi-

tional compensation, when it appeared that he was being required to exceed the requirements of his contract, which might have afforded some evidence of cost. We are not concerned with this defection on the part of the contractor as a defense available to the defendant; we mention it only for the bearing it has on the question of the extent to which plaintiff may be entitled to further compensation for work not required by his contract. Plaintiff orally protested to the project engineer, and at a later date informed the supervising engineer in writing that he expected to be paid for the work at the scale provided for dry rubble wall. But no steps were taken by the contractor to state his costs or to secure a change order, so as to present to the contracting officer any knowledge of, or basis for, plaintiff's claim to an equitable adjustment increasing the contract price. So far as the proof shows no record was made by the contractor of what he may have believed were extra expenses incurred as a result of unwarranted demands by the engineer. In the hearings plaintiff's efforts were confined to an attempt to show that the wall the contractor was required to erect was a dry rubble masonry wall, or if not such a wall, at least something approximating that type of structure. Nothing is shown as to how much the wall erected actually cost him nor how much his cost of performance was increased by being required to erect such a wall, as against the type he had agreed to build for 90 cents a cubic yard.

The difficulty involved in plaintiff's presentation of this item of claim is twofold. First, assuming that the wall actually constructed was a dry rubble masonry wall, it would not follow that he would be legally or equitaby entitled to be paid for such at $8.00 a cubic yard. This rate defendant promised to pay the contractor for erecting approximately 150 cubic yards of dry rubble masonry elsewhere on the project. It did not agree to pay for an additional 2,300 or 2,400 cubic yards at such unit price. It was not within the power of the project engineer to commit the Government to pay such a fixed price by requiring the contractor to construct such additional amount of dry rubble masonry in lieu of the hand laid rock embankment. Under article 3 of the contract the authorized representative might have authorized such a change in the contract, but no such change was in fact made. No such undertaking, as plaintiff's theory of recovery would seem to presume, is expressed in the contract documents, nor may such an undertaking be implied from the facts. At most the unit price stated in the bid schedule for a relatively small amount of dry rubble masonry would evidence the estimated cost of performing such work, plus a reasonable profit, without regard to a possible decrease in such unit cost where a greatly increased quantity of such work was involved. Second, since the record shows that the wall or embankment constructed was not tantamount to a dry rubble masonry wall, plaintiff leaves the record in a condition which makes it difficult to fix a basis upon which to determine with exactness what additional amount of payment would be necessary in order to compensate the contractor for the added costs he incurred in meeting the demands of the defendant's engineer.

Certain basic differences between the structure plaintiff erected at Station 489+40 and the type of wall described in the specifications as dry rubble masonry preclude us from finding that the structure plaintiff was required to construct was, in all substantial respects, the type of wall for which, under the terms of their contract, plaintiff and defendant had agreed upon a unit price of $8 per cubic yard. The structure erected by plaintiff was essentially a cover and support for a steepened embankment, and depended, in turn, upon the embankment against which it lay for a part of its upright support. By contrast, dry rubble masonry as provided for in the specifications contemplated a structure depending solely upon its own construction for upright support. Plaintiff's structure reached a height of approximately 52 feet, from a base of between six and eight feet, whereas the specification for dry rubble masonry required that the base thickness of dry walls should be at least one-half the height, which should not exceed eight feet. The latter type of structure required the uniform use of headers so as to comprise approximately one-fifth of the exposed faces, and these headers had either to extend entirely

274

through 'from front to back face of the wall or overlap at least six inches. This would appear essential to a free standing structure. Plaintiff's structure employed headers to a considerable extent to provide a bonding, but it does not appear that the contractor was required to perform such bonding to the extent required to meet the specifications for dry rubble masonry.

On the other hand the work which plaintiff was required to perform in building the rock embankment in some respects called for a manner and quality of performance demanded by the specifications for dry rubble masonry, but not reasonably required to meet the specifications for hand laid rock embankment. The use of stone of a volume not less than one cubic foot, entailing the need of machinery in putting it in place, the dressing of the stone so as to fit neatly and snugly, necessitating the employment of experienced stone masons, the emphasis placed upon the work being conducted in conformity with the engineer's directions, were standards required to be met under the specifications for dry rubble masonry but not for the type of structure which plaintiff had contracted to erect under his unit bid price.

The substance of the findings of fact respecting this item of claim is that the contractor was required by defendant's project engineer in charge of the work and the supervising engineer to build, and the Government obtained, a better wall than that which it was intended the contractor should build for 90 cents per cubic yard; that the contract did not call for this wall; that in certain material respects the contractor was required to perform his work as though it was part of that work for which the contract fixed a price of $8.00 per cubic yard; and that in such respects the contractor was put to a large amount of additional work and expense not covered by his contract price.

Our conclusion from such facts is that, disregarding plaintiff's failure to comply fully with the equitable adjustment provisions of the contract contained in Article 3 thereof, on account of the increased burden of performance imposed upon him, a meritorious basis exists for allowing plaintiff some additional payment on account of the rock embankment constructed, but that plaintiff is not legally or equitably entitled to an additional payment in the amount of, nor on the basis asserted in, the claim filed on March 17, 1938, as set forth in finding 21. The next question is whether any other reasonable basis of computation of the amount which should be allowable is afforded us by the evidence.

As we have on other occasions pointed out, when the plaintiff has proven that the contract was breached and that he was in fact damaged as a result of defendant's breach, absolute certainty as to the amount of damages is not essential, this being a matter for reasonable determination according to the circumstances of each case. The underlying principle is full compensation for the wrong done, and the general rule is that the compensation shall be equal to the injury. "The breach is the standard by which the compensation is to be measured, and all that the law requires is that such damages be allowed as, in the judgment of fair men, directly and naturally resulted from the breach of the contract for which the suit is brought." Needles v. United States, 101 Ct.Cl. 535, 618. " 'It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate.' * * * Furthermore, a defendant, whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684.

Part of the task assigned by the statute under the Congressional reference in this case is to give Congress such findings of fact and conclusions thereon as shall be sufficient to inform it of the amount, if any, legally or equitably due from the United States to the claimant. The proof is not sufficient to permit us to state a conclusion as to the amount "legally or equitably due" on this item of claim, within the strict meaning ordinarily to be ascribed to those words by this court upon a Congressional reference. See Vance v. United States, 30 Ct.Cl. 252, 266; Montgomery v. United

States, 49 Ct.Cl. 574, 575, 621. With this limitation, we express our conclusion that under the circumstances of this case it appears that in certain very material respects the contractor was required to construct his embankment in the manner of a dry rubble masonry wall for which the parties had agreed upon a rate of $8.00 per cubic yard for such work elsewhere on the project, and that an increase in the unit price for the embankment constructed by plaintiff, from 90 cents to $4.00 per cubic yard, will furnish a fair and reasonable measure of compensation for the additional cost of performance the contractor was unjustly required to incur. On this basis there would be due plaintiff for this item of claim the sum of $7,398.15, after allowing a credit for the amount already paid under plaintiff's unit price bid of 90 cents per cubic yard for hand laid rock embankment—Type B. In view of the price fixed in the contract for the superior type of structure on which plaintiff's work was largely modeled this figure will not require the Government to pay more than just compensation. If it be less than might have been due plaintiff had his actual costs been shown such loss must lie in his failure to afford a better means of ascertaining the measure of his injury.

### Use of Material on Right-of-Way
### (Finding 22)

In this item of claim plaintiff seeks to recover damages in the amount of $14,950 for breach of a provision of the specifications with respect to the contractor's rights in and use of materials found on the work. The substance of this provision is set forth in the finding with reference to this claim, from which it is clear that if the contractor had exercised his right to use stone from the right-of-way for crushing for stone surfacing, he would have had to replace the stone at his own expense with other suitable material to the extent the stone so used would otherwise have been used in embankments, backfills, etc. The contractor sought to avail himself of this right by announcing to the associate highway engineer his intention to use the stone between Stations 489 and 505 for surfacing and masonry. He asked approval of such use of the stone, the right to so employ such excavated material being, under the provision of the specifications above referred to, made conditional upon its being of suitable quality. From the facts found it does not appear, as plaintiff contends, that the contractor was wrongfully deprived by defendant of his right to use the stone in the manner provided in the specifications. Defendant's engineer simply informed the contractor that if any of the stone in question was surplus to that needed for embankments, and met the necessary tests for stone surfacing, it could be employed for that purpose. So far as the evidence shows no further issue was made of the matter. The contractor did not insist that his right to use the stone for surfacing was absolute, nor undertake to place himself in a position to claim that he was wrongfully deprived of such right, by showing his ability to replace the stone he sought to use for surfacing with other material suitable for the embankments, and by establishing the suitable quality of the right-of-way stone for surfacing purposes. There is an absence of any sufficient showing of a breach upon which to rest plaintiff's claim to damages.

If plaintiff had established that defendant wrongfully deprived the contractor of his right to use the stone for stone surfacing, plaintiff's damages would be no more than nominal on the basis of the facts established and no basis would be afforded for further payment from the Government. If the contractor had been allowed to use the stone from the right-of-way in the manner desired, his position with regard to the net result of performance of his contract obligations as to roadway excavation, stone surfacing, and embankments would not have been altered. Whatever advantage he might have gained by way of stone surfacing costs he would have lost in replacing the stone required for embankments. Under his contract plaintiff was obligated to excavate the stone from the right-of-way between Stations 489 and 505, whether he used it for crushing and stone surfacing, or employed it on the nearby rock embankments. In either event the stone so removed would be measured as unclassified excavation, and the excavation paid for at the rate of 30 cents per cubic yard. And in

either event it would have been necessary for the contractor to obtain further stone from some other source to satisfy the crushed stone surfacing requirements because of the project engineer's allocation of the right-of-way stone to embankment construction, as actually occurred, or to fill the need for rock on the embankments as would have transpired had the project engineer acceded to the contractor's initial request.

This latter factor is entirely ignored in plaintiff's statement of claim, which we have set out in finding 22. We fail to see, in what respect the contractor would have been either put to less expense or placed in a position to receive more money under the contract had he proceeded with the work as he originally planned. Nothing is due plaintiff under this item of claim.

The foregoing special findings of fact, the conclusion thereon, and this opinion on the several items of the claim, under the terms of the resolution of reference, will be certified to the Senate in accordance with Senate Resolution 256. It is so ordered.